**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELANA GORCHOV, on behalf of herself and all others similarly situated,<br>Plaintiff,<br><br>v.<br><br>PELOTON INTERACTIVE, INC.,<br>Defendant. | **COMPLAINT**<br>Case No. ________________<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Elana Gorchov ("Plaintiff"), on behalf of herself and all others similarly situated, by and through undersigned counsel of record, brings this action against Defendant Peloton Interactive, Inc. ("Defendant" or "Peloton"). The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to herself and her own actions and counsel's investigations, and upon information and belief as to all the other matters, are as follows:

## NATURE OF THE CASE

1. This class action arises from Peloton's retention of windfall profits generated by unlawful tariffs imposed by the federal government under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq.*

2. Beginning in February 2025, the federal government imposed sweeping tariffs on imports from numerous countries under purported authority of the IEEPA. Those tariffs dramatically increased the cost of imported consumer goods sold in the United States.

3. Major U.S. importers—including Peloton—responded by increasing prices on consumer goods to offset the cost of these tariffs. As a result, American consumers paid higher retail prices for consumer goods reflecting the economic burden of those tariffs.

4. On February 20, 2026, the Supreme Court of the United States held that IEEPA-based tariffs were unlawful. *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026).

5. As a consequence of that decision, importers who paid tariffs—including Peloton—became entitled to refunds of duties they previously paid to U.S. Customs and Border Protection ("CBP").

6. The economic reality of the tariff regime, however, is that importers like Peloton did not ultimately bear all costs of the tariffs. Instead, the importers passed the inflated costs on to consumers in the form of higher retail prices.

7. Peloton therefore collected the tariff costs from consumers through this inflated pricing, while seeking refunds of the same tariff payments from the federal government.

8. Unless restrained by this Court, Peloton stands to recover the same tariff payments twice—once from consumers through higher prices and again from the federal government through tariff refunds, including interest paid by the government on those funds.

9. Peloton has made no legally binding commitment to return tariff-related overcharges to the customers who actually paid them.

10. This lawsuit seeks to prevent that unjust result.

11. Plaintiff brings this action on behalf of hundreds of thousands of consumers who purchased goods from Peloton during the tariff period and who paid inflated prices reflecting Peloton's pass-through of unlawful tariffs.

12. Plaintiff seeks restitution of those tariff overcharges, together with appropriate declaratory, injunctive, and monetary relief.

## JURISDICTION AND VENUE

13. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because: (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action. The Court has personal jurisdiction over Defendant because Peloton is headquartered in this District, conducts significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is located in this District in Manhattan, New York, and a substantial portion of the events and conduct giving rise to the claims occurred in the Southern District of New York.

## PARTIES

15. Plaintiff Elana Gorchov is a resident of Great Neck, New York, and a citizen of the State of New York. During the Class Period, Plaintiff Gorchov purchased goods from Peloton that were imported from countries subject to the IEEPA tariffs. Plaintiff Gorchov paid retail prices for those goods that were increased by Peloton to account for the tariffs imposed on imported products. Plaintiff Gorchov would not have paid those higher prices absent the unlawful tariffs and Peloton's pass-through of those tariffs to consumers.

16. Defendant Peloton is a Delaware corporation, incorporated in 2015, with its principal place of business at 441 Ninth Avenue, Sixth Floor, New York, New York 10001. Peloton designs, develops, markets, and sells connected fitness equipment, software, and subscription content directly to consumers in the United States and internationally, including through its website.[1] Peloton's products include the Peloton Cross Training Series Bike, Bike+, Tread, Tread+, and Row+, as well as associated connected fitness subscriptions and accessories. A significant portion of the products Peloton sells are imported goods subject to IEEPA tariffs imposed by the United States government.

## FACTUAL BACKGROUND

### A. Peloton's Business

17. Peloton is one of the leading developers and marketers of connected fitness equipment and digital fitness services in the United States. The company provides fitness and

[1] *See* www.onepeloton.com (last accessed July 30, 2026).

wellness products and services to approximately six million members across the United States and internationally.[2]

18. In 2014, Peloton began selling its first connected fitness bike in the United States (the Peloton Bike),[3] which introduced consumers to a new model of home fitness combining internet-connected exercise equipment with live and on-demand instructor-led classes streamed through a touchscreen.

19. Over the following years, Peloton released additional connected fitness products, including the Peloton Bike+, Tread, Tread+, and Row.[4]

20. Most recently, Peloton released updated versions of those same connected fitness products in October 2025, which it now markets as the "Cross Training Series," including the Cross Training Bike, Bike+, Tread, Tread+, and Row+.[5]

21. Peloton manufactures its goods, including its connected fitness hardware, outside of the United States, primarily in Taiwan through its contract manufacturer, Rexon Industrial Corporation.[6] In public filings, Peloton has also recognized that it has paid IEEPA tariffs for goods imported from China, Taiwan, Thailand, and Vietnam.[7] Because Peloton imports the connected

---

[2] *See* Complaint, *Peloton Interactive, Inc. et al. v. United States et al.*, No. 1:26-cv-00135 (Ct. Int'l Trade), ECF No. 4 at ¶ 10.

[3] *See* Peloton Interactive, Inc., Registration Statement on Form S-1, at 98 (Aug. 27, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1639825/000119312519230923/d738839ds1.htm (last visited July 31, 2026) (noting that Peloton's products include the "Peloton Bike, launched in 2014").

[4] *See* Press Release, Peloton Interactive, Inc., Peloton Releases Peloton Row and New Features on Peloton Guide (Sept. 20, 2022), *available at* https://investor.onepeloton.com/news-releases/news-release-details/peloton-releases-peloton-row-and-new-features-peloton-guide (last visited July 30, 2026).

[5] *See* Lindsey Ellefson, *How Peloton's New Line of Fitness Equipment Stacks Up Against the Existing Models,* LIFEHACKER (Oct. 2, 2025), https://lifehacker.com/health/peloton-new-upgraded-cross-training-bike-treadmill-row (last visited July 31, 2026) (analyzing the Cross Training models, stating "all of these devices are functionally similar to their predecessors. You cycle on the Bike, run on the Tread, and row on the Row, just as you always did.").

[6] *See* Peloton Interactive, Inc., Annual Report on Form 10-K, at 15 (Aug. 7, 2025), *available* at https://www.sec.gov/Archives/edgar/data/1639825/000163982525000138/pton-20250630.htm (last visited July 30, 2026) (stating "We are solely reliant on contract manufacturers for all of our manufacturing needs . . . a large number of our contract manufacturers' primary facilities are located in Taiwan, China and Thailand."); Peloton Interactive, Inc., Current Report on Form 8-K at Exhibit 99.1 (July 12, 2022), *available at* https://investor.onepeloton.com/static-files/81501abb-a399-4e72-980b-9df0207af3d7 (last visited July 30, 2026) (stating "[Peloton] today announced it is exiting all owned-manufacturing operations and expanding its current relationship with leading Taiwanese manufacturer Rexon Industrial Corp . . . Rexon will become the primary manufacturer for the hardware for Peloton's iconic Bike and Tread product lines.").

[7] *See supra* note 2 at ¶¶ 54-57.

fitness hardware it sells, the IEEPA tariffs directly increased Peloton's cost of importing merchandise into the United States.

**B. The IEEPA Tariffs**

22. Beginning in February 2025, President Trump invoked the IEEPA to impose tariffs on imports from numerous foreign countries pursuant to a series of executive orders declaring national emergencies related to trade and supply chain concerns.[8]

23. Those executive orders imposed sweeping tariffs on imports from key U.S. trading partners. The orders included duties of approximately 25 percent on many imports from Canada and Mexico and additional tariffs on imports from China that were layered on top of existing duties, resulting in substantially higher effective tariff rates on Chinese goods.[9]

24. The tariffs significantly increased the cost of imported consumer goods entering the United States, particularly for retailers and other businesses that rely heavily on international supply chains to source merchandise—like Defendant Peloton.[10]

25. Under U.S. customs law, the importer of record is responsible for paying tariffs when goods enter the United States. Accordingly, importers of record—including sellers such as Peloton—were required to pay IEEPA tariffs to CBP upon entry of covered merchandise into the country.[11]

26. Numerous importers challenged the legality of the IEEPA tariffs in the United States Court of International Trade, arguing that the President lacked statutory authority under IEEPA to impose tariffs of that nature.[12]

---

[8] *See* Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025); Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025); Exec. Order No. 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025); Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025) (imposing "reciprocal" country-specific tariffs on imports from numerous U.S. trading partners, including Taiwan, Thailand, and Vietnam).

[9] *See* Reuters, *Trump Orders Tariffs on Canada, Mexico and China*, Feb. 1, 2025.

[10] *See* Mary Amiti, Stephen J. Redding & David E. Weinstein, *The Impact of the 2018 Trade War on U.S. Prices and Welfare*, 33 J. ECON. PERSP. 187 (2019).

[11] *See* U.S. Customs & Border Prot., *Importing Into the United States: A Guide for Commercial Importers*.

[12] *See, e.g.*, *V.O.S. Selections, Inc. v. United States*, No. 1:25-cv-00066 (Ct. Int'l Trade filed Apr. 14, 2025).

27. On February 20, 2026, the Supreme Court of the United States held that the challenged tariff regime was unlawful and that IEEPA does not authorize the President to impose tariffs of the type challenged in that litigation and invalidated the tariff orders issued pursuant to that statute.[13]

28. The Supreme Court's decision eliminated the legal basis for IEEPA tariffs and created a pathway for importers that had paid those duties—including large sellers such as Peloton—to seek refunds of the tariffs previously collected by the federal government.

**C. Tariffs Are Economically Borne by Consumers**

29. Economists and government agencies widely recognize that tariffs are largely borne by domestic consumers rather than foreign exporters or importing firms that formally remit the duties.

30. Economic studies examining recent U.S. tariff regimes consistently find that the cost of tariffs is passed through into higher prices paid by U.S. purchasers of imported goods.[14]

31. When tariffs increase the cost of imported goods, retailers and other downstream sellers typically raise prices to offset those additional costs. Surveys of U.S. businesses conducted by the Federal Reserve Bank of New York during the recent tariff period found that a large majority of firms facing tariff-related cost increases passed at least some portion of those costs through to their customers in the form of higher prices.[15] Companies treat tariffs as costs to be incorporated into their pricing structures.

32. Peloton followed this same exact pattern during the tariff period. As a major importer of goods, Peloton faced increased costs resulting from tariffs on its products and took

---

[13] *See Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026).

[14] *See* Julian Hinz et al., *America's Own Goal: Who Pays the Tariffs?*, KIEL INST. FOR THE WORLD ECON. POLICY BRIEF No. 201 (Jan. 2026); *see also* Mary Amiti, Stephen J. Redding & David E. Weinstein, *The Impact of the 2018 Trade War on U.S. Prices and Welfare*, 33 J. ECON. PERSP. 187 (2019).

[15] *See* Jaison R. Abel, Richard Deitz, Sebastian Heise, Benjamin Hyman & Nick Montalbano, *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, FED. RSRV. BANK OF N.Y., LIBERTY STREET ECON. (June 4, 2025), *available at* https://libertystreeteconomics.newyorkfed.org/2025/06/are-businesses-absorbing-the-tariffs-or-passing-them-on-to-their-customers/.

steps to address those cost pressures through pricing and merchandising decisions.

33. Indeed, as detailed below, Peloton executives publicly acknowledged that tariffs would affect pricing decisions and the company's cost structure. In those communications, Peloton leadership explained that tariffs increased the company's costs and required Peloton to evaluate price adjustments and other operational responses designed to manage those expenses.

34. As a result, consumers who purchased goods from Peloton during the tariff period paid elevated prices, reflecting the tariff-related cost increases incorporated into Peloton's retail pricing.

**D. Peloton's Statements Regarding Tariff-Related Price Increases**

35. Peloton publicly acknowledged, early in the tariff period, that IEEPA tariffs would increase its costs and necessitate upward adjustments to consumer prices.

36. On August 7, 2025, Peloton published its Q4 FY2025 Shareholder Letter, in which CEO Peter Stern disclosed that Peloton anticipated tariff exposure of approximately $65 million in fiscal year 2026, and stated that the company would "become more sophisticated in our use of promotions and will adjust prices to reflect our costs—including shipping, returns, tariffs, and other fees we pay."[16]

37. During Peloton's Q4 FY2025 earnings call held the same day, CFO Liz Coddington confirmed the specific nature and source of Peloton's tariff exposure, stating: "[W]e are subject to country-specific reciprocal tariffs for Peloton and Precor[17] equipment, including but not limited to, Peloton and Precor equipment imported from Taiwan . . . ."[18] The Q4 FY2025 Shareholder

[16] *See* Peloton Interactive, Inc., Q4 FY2025 Shareholder Letter (Aug. 7, 2025), at 2, *available at* https://www.sec.gov/Archives/edgar/data/1639825/000163982525000132/q42025shareholderletter.htm (last visited July 31, 2026).

[17] Precor Incorporated ("Precor") is a wholly-owned subsidiary of Peloton that designs and manufactures commercial fitness equipment sold to gyms, hotels, and other business customers. Peloton's consumer-facing connected fitness products at issue in this action are sold directly to consumers under the Peloton brand, not through Precor.

[18] *Peloton Interactive, Inc. (PTON) Q4 2025 Earnings Call Transcript*, SEEKING ALPHA (Aug. 7, 2025), https://seekingalpha.com/article/4810449-peloton-interactive-inc-pton-q4-2025-earnings-call-transcript (last visited July 31, 2026).

Letter further confirmed that Peloton's anticipated tariff impact of approximately $65 million in fiscal year 2026 was a direct and material factor in the company's financial projections.[19]

38. During the Q4 FY2025 earnings call, CEO Peter Stern elaborated on the direct causal link between tariff costs and consumer pricing, stating: "We continue to improve our unit economics and will adjust prices to reflect the value we provide to our members and the cost of operating our business, including shipping, returns, tariffs and other fees we pay."[20]

39. Consistent with that announced pricing strategy, Peloton took its first concrete pricing action effective August 19, 2025, by introducing mandatory "expert assembly" fees on purchases of new connected fitness hardware—fees that had been previously included in the purchase price. Assembly fees ranged from $150 for the Bike and Bike+ to $299 for the Tread+.[21] For certain products, including the Tread+, expert assembly was required with no self-install option, making the fee a de facto price increase.[22]

40. On October 1, 2025, approximately two months after explicitly linking tariff costs to future price adjustments, Peloton implemented its most sweeping price increases in years across both hardware and subscriptions. Hardware price increases ranged from $200 to $700 per device across the newly launched Cross Training Series, despite those products having the same essential functionality as those that came before.[23]

41. Peloton's public statements and actions thus confirmed two critical points: first, that tariffs increased Peloton's costs on imported goods; and second, that Peloton was making pricing decisions in response to those tariff-driven cost increases. Notably, Peloton made no

[19] *See supra* note 16 at 7 ("This target reflects our current expectations for a roughly $65 million impact to Free Cash Flow as a result of tariff exposure, which is a dynamic situation and may change over time.").

[20] *See supra* note 18.

[21] Chris Lewis, *"Expert Assembly" Fees Added to Peloton Bike/Bike+/Tread+ (Row & Tread Soon Too)*, PELOBUDDY.COM (Aug. 19, 2025), https://www.pelobuddy.com/expert-assembly-fees/ (last accessed July 31, 2026) (specifying the new expert assembly fees for Peloton devices).

[22] *See id.* ("Not every device has the free self-assembly option at this time. For example, the expert assembly is required on the Peloton Tread+—there is no self-delivery option. This means this is effectively a price increase on some Peloton devices . . . Peloton had previously said some adjustments would be made to 'reflect their true costs.'").

[23] *See* Lindsey Ellefson, *How Peloton's New Line of Fitness Equipment Stacks Up Against the Existing Models,* LIFEHACKER (Oct. 2, 2025), https://lifehacker.com/health/peloton-new-upgraded-cross-training-bike-treadmill-row (last visited July 31, 2026) (analyzing the Cross Training models, stating "all of these devices are functionally similar to their predecessors. You cycle on the Bike, run on the Tread, and row on the Row, just as you always did.").

announcement of any plan to pass tariff savings back to consumers should those tariffs be reduced or refunded.

42. These public admissions are consistent with Peloton's broader financial disclosures during the Class Period. During its Q1 FY2026 earnings call on November 6, 2025, Peloton's CEO Peter Stern confirmed the company was "continu[ing] to monitor and respond to evolving tariff policies," while also "building on the actions we took in Q1 and on October 1"[24]—directly referencing the price increases implemented on October 1, 2025. Peloton did not simply absorb the full cost of the tariffs; rather, Peloton passed on at least part of those costs to consumers through higher retail prices.

43. Peloton's own public statements and actions therefore establish a coherent timeline: Peloton acknowledged tariff-driven cost increases in August 2025 and committed to adjusting prices accordingly; introduced assembly fees as an initial pricing adjustment effective August 19, 2025; and implemented sweeping price increases across its hardware (and subscription services) on October 1, 2025—all while projecting a $65 million tariff impact on its fiscal year 2026 operations.

44. Peloton's tariff exposure, as disclosed in successive earnings communications, declined over the course of the Class Period and thereafter. Peloton disclosed estimated tariff exposure of $65 million in August 2025,[25] approximately $45 million in February 2026,[26] and $30 million in May 2026.[27] Throughout this period of declining tariff exposure, Peloton did not reduce its consumer prices, did not issue refunds to consumers, and made no commitment to return any

[24] *Peloton (PTON) Q1 2026 Earnings Call Transcript*, THE MOTLEY FOOL (Nov. 27, 2025), https://www.fool.com/earnings/call-transcripts/2025/11/27/peloton-pton-q1-2026-earnings-call-transcript/ (last accessed July 31, 2026).

[25] *See supra* note 16 at 7.

[26] *Peloton (PTON) Q2 2026 Earnings Call Transcript*, THE MOTLEY FOOL (Feb. 5, 2026), https://www.fool.com/earnings/call-transcripts/2026/02/05/peloton-pton-q2-2026-earnings-call-transcript/ (last accessed July 31, 2026) ("Our free cash flow reflects an expectation for a roughly $45 million impact from tariff exposure, in line with our expectations last quarter.").

[27] *Peloton (PTON) Q3 2026 Earnings Transcript*, THE MOTLEY FOOL (May 7, 2026), https://www.fool.com/earnings/call-transcripts/2026/05/07/peloton-pton-q3-2026-earnings-transcript/ (last accessed July 31, 2026) ("So we expect tariffs to represent $30 million of free cash flow exposure for our full year '26, which is a reduction of $15 million relative to the $45 million that we shared last quarter.").

portion of tariff-related charges to the consumers who paid them. The declining tariff exposure thus did not inure to the benefit of consumers; instead, it accrued exclusively to Peloton's financial benefit. Peloton's most recent annual results confirm the point: on August 6, 2026, Peloton reported record full-year free cash flow of $378 million for fiscal year 2026, while continuing to reference its ability "to obtain any tariff refunds or rebates"—and still without announcing any plan to return tariff-related overcharges to consumers.[28]

45. Accordingly, Plaintiff and Class Members paid tariff-inflated prices at Peloton during the Class Period, while Peloton now seeks to retain both the consumer pass-through and any government refund of the same unlawful tariff charges.

**E. Peloton's Lawsuit Seeking Tariff Refunds**

46. On January 7, 2026, Peloton filed suit in the United States Court of International Trade challenging the legality of the tariffs imposed under IEEPA. Peloton brought the action in its capacity as a U.S. importer that had paid duties under the challenged tariff regime.[29]

47. In that action, Peloton sought declaratory and injunctive relief invalidating the IEEPA tariffs and requested refunds of all duties collected from Peloton under those tariff orders.[30]

48. As described above, in February 2026, the Supreme Court held that the President's tariff regime exceeded the statutory authority granted by IEEPA and invalidated the challenged tariff orders.[31] Following the Supreme Court's decision, importers that had paid IEEPA tariffs—including Peloton—became eligible to pursue refunds of those duties.

49. On March 4, 2026, the Court of International Trade in *Atmus Filtration, Inc. v. United States*, ordered CBP to stop liquidating IEEPA duties and to reliquidate previously

[28] *See* Press Release, Peloton Interactive, Inc., Peloton Announces Q4 & FY2026 Financial Results (Aug. 6, 2026), *available at* https://investor.onepeloton.com/news-releases/news-release-details/peloton-announces-q4-fy2026-financial-results (last visited Aug. 9, 2026).
[29] *See Peloton Interactive, Inc. et al. v. United States et al.*, No. 1:26-cv-00135 (Ct. Int'l Trade filed Jan. 7, 2026).
[30] *Id.*
[31] *See Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026).

liquidated IEEPA duties where possible, and indicated that the relief extended to "all importers of record" that paid IEEPA duties, including importers that had not filed their own refund suits.[32]

50. The potential refund pool resulting from the invalidation of the IEEPA tariffs is enormous. Public reporting concerning the refund proceedings states that CBP estimated an "unprecedented volume of refunds," potentially involving 53,173,939 refunds across 330,566 importers if each entry subject to IEEPA duties is entitled to a refund.[33] On April 20, 2026, CBP began issuing refunds of IEEPA duties, with interest, in phases through its "Consolidated Administration and Processing of Entries" ("CAPE") process.[34]

51. Peloton is a significant importer of connected fitness equipment and therefore stands to recover substantial sums if tariff refunds are paid.

52. Given Peloton's scale as a major importer, Peloton can expect to recover significant tariff refunds corresponding to duties it paid during the Class Period. Those expected refunds are especially significant here because Peloton previously passed tariff-related cost increases through to consumers in the form of higher retail prices, meaning Peloton now seeks to recover from the government duties whose economic burden was borne, in whole or in part, by Plaintiff and Class Members.

53. In practical terms, Peloton stands to receive a windfall: it has already recouped tariff costs from consumers through higher prices, and it now stands in line to recover those same unlawful tariff payments from the federal government.

**CLASS ALLEGATIONS**

54. The proposed Class is defined as follows:

> All persons in the United States who purchased goods directly from Peloton during the period October 1, 2025, through February 24, 2026.

[32] *See Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l Trade Mar. 4, 2026), ECF No. 21, superseded by Am. Order, ECF No. 29 (Mar. 5, 2026).
[33] *See* Thompson Hine LLP, *CIT Suspends Earlier Order Directing IEEPA Tariff Refunds* (Mar. 6, 2026), https://www.thompsonhinesmartrade.com/2026/03/cit-suspends-earlier-order-directing-ieepa-tariff-refunds/.
[34] *See* U.S. Customs & Border Prot., *International Emergency Economic Powers Act (IEEPA) Duty Refunds*, https://www.cbp.gov/trade/programs-administration/trade-remedies/ieepa-duty-refunds (last visited Aug. 9, 2026); *see also* U.S. Customs & Border Prot., CSMS #68340863, Consolidated Administration and Processing of Entries (CAPE) for IEEPA Refunds, April 20, 2026, Deployment (Apr. 2026).

55. Excluded from the Class are:

a. Defendant and any entities in which Defendant has a controlling interest;

b. Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant;

c. The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d. All persons or entities that properly execute and timely file a request for exclusion from the Class; and

e. Any attorneys representing the Plaintiff or the Class.

56. A class action is the proper forum to bring Plaintiff's claims under Federal Rule of Civil Procedure ("FRCP") 23. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

57. This action satisfies all of the implicit and explicit requirements of FRCP 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

58. **Numerosity:** the Class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. Given the consumer base of Peloton, the class numbers are likely in the hundreds of thousands.

59. **Commonality:** the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

a. whether Peloton paid tariffs imposed under the International Emergency Economic Powers Act ("IEEPA") on imported goods during the Class Period;

b. whether Peloton increased retail prices on goods sold to consumers in response to those tariffs;

c. whether Peloton passed through some or all of the tariff costs to consumers through higher prices;

d. whether Peloton sought or will seek refunds of those tariffs from the federal government;

e. whether Peloton's retention of tariff refunds corresponding to tariff costs paid by consumers constitutes unjust enrichment or money had and received; and

f. what is the appropriate measure of restitution, damages, or other relief resulting from Peloton's conduct.

60. **Typicality:** Plaintiff's claims are typical of those of the other Class Members because Plaintiff, like every other Class Member, bought products from Peloton subject to tariff-related price increases.

61. The claims of the Class Representative Plaintiff are furthermore typical of other Class Members because she makes the same claims as other Class Members. Plaintiff has an interest in seeking compensation from Defendant.

62. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class in that she has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages she has suffered is typical of other Class members.

63. **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available

methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical.

64. The nature of this action and the nature of New York laws available to Plaintiff and the Class makes the use of the class action device particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged. Without the class action mechanism, Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

65. Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

66. Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

67. The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

## CLAIMS FOR RELIEF

**COUNT I**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

68. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 67 as though fully set forth herein.

69. Plaintiff brings this Count on behalf of all Class Members.

70. Plaintiff and the Class have conferred a benefit upon Defendant in the form of money paid through tariff-inflated prices on goods during the period October 1, 2025, to February 24, 2026.

71. Defendant received and accepted that benefit and was thereby enriched. Defendant has retained the benefit conferred by Plaintiff without paying or otherwise compensating Plaintiff for its value.

72. The circumstances surrounding Defendant's receipt and retention of this benefit make it unjust and inequitable for Defendant to retain it without payment to Plaintiff. Defendant obtained these funds through price increases on goods subject to unlawful tariffs and has retained the resulting profits.

73. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten profits when Defendant is seeking a refund of the duties it paid.

74. Under New York law, Plaintiff and the Class are entitled to full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT II**
**Money Had and Received**
**(On Behalf of Plaintiff and the Class)**

75. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 67 as though fully set forth herein.

76. Plaintiff brings this Count on behalf of all Class Members.

77. Defendant received funds from Plaintiff and each Class Member in the form of money paid through tariff-inflated prices on goods during the period October 1, 2025, to February 24, 2026. The Supreme Court has determined that the IEEPA tariffs which resulted in the price inflation were unlawful.

78. The funds belonged to Plaintiff and to each Class Member.

79. Defendant has not returned the funds. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten gains. Plaintiff seeks the return of funds in an amount to be proven at trial.

80. Plaintiff seeks all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, injunctive relief, and other remedies available to her on behalf of herself and the putative Class.

**COUNT III**
**Declaratory Relief**
**28 U.S.C. § 2201**
**(On Behalf of Plaintiff and the Class)**

81. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 67 as though fully set forth herein.

82. Plaintiff brings this Count on behalf of all Class Members.

83. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

84. Plaintiff's claims present an actual controversy as to the rightful ownership of the tariff pass-through collected by Defendant.

85. Plaintiff has suffered an injury by having been required to pay Defendant a tariff pass-through because of the subject tariffs on Defendant's product. And Plaintiff will imminently suffer an injury by Defendant's unlawful retention of the tariff refund.

86. This Court can exercise its equitable power to enter a declaratory judgment that retention of the tariff pass-through paid by Plaintiff but refunded to Defendant is unlawful for any of the above reasons.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed class pray for relief and judgment against Defendant, as follows:

a. For an order certifying the proposed classes, appointing Plaintiff and her counsel to represent the proposed class and notice to the proposed classes to be paid by Defendant;

b. For damages suffered by Plaintiff and members of the proposed class;

c. For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Defendant;

d. For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful and unfair practices alleged in the Complaint;

e. An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendant's past conduct;

f. For Plaintiff's reasonable attorneys' fees, as permitted by law;

g. For Plaintiff's costs incurred;

h. For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i. For such other and further relief that this Court deems just and proper under equity or law.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and Class Members, demands a trial by jury as to all issues triable as of right.

DATED this 2nd day of September, 2026.

Respectfully submitted,

*/s/ Gregory Haroutunian*
**EMERY | REDDY, PC**
Gregory Haroutunian (No. 5187430)
M. Anderson Berry*
333 University Ave, Ste 200
Sacramento, CA 95825
916.823.6955 (Tel)
206.441.9711 (Fax)
gregory@emeryreddy.com
anderson@emeryreddy.com

**MEYER WILSON WERNING CO., LPA**
Matthew R. Wilson*
mwilson@meyerwilson.com
Ryne E. Tipton *
rtipton@meyerwilson.com
305 W. Nationwide Blvd.
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

**LEVIN LAW, P.A.**
Brian Levin*
brian@levinlawpa.com
2665 South Bayshore Drive, PH2B
Miami, Florida 33133
Telephone: 305-539-0593

**Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff*